UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TADIEM, INC., d/b/a BENSIMON BYRNE,<br><br>                                               Plaintiff,<br>                      -against-<br><br>CONSTELLATION BRANDS, INC.,<br><br>                                               Defendant. | Civil Action No.: 19-cv-6215<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tadiem Inc., doing business as Bensimon Byrne ("Tadiem"), by its attorneys, Olshan Frome Wolosky LLP, for its Complaint against defendant Constellation Brands, Inc. ("Constellation"), alleges as follows:

## NATURE OF THE ACTION

1. This is a failure to pay case arising out of the flagrant refusal by Defendant Constellation, a Fortune 500 company owning international liquor and spirits brands, to compensate Plaintiff Tadiem, a small Toronto advertising company, for professional services Constellation agreed to, requested, and received pursuant to a Master Services Agreement ("MSA") between those parties.

2. Constellation, in combination with the efforts of its auditor, AARM, has attempted to renegotiate over a million dollars in fees Constellation owes to Tadiem, in violation of the MSA, through strong-arm tactics designed to "starve out" Tadiem and force it to accept a substantial discount on its fees or to receive nothing, including nearly $400,000 that Constellation has admitted in writing it owes Tadiem.

3. Tadiem refuses to succumb to Constellation's commercial bullying tactics and brings this action seeking redress.

## THE PARTIES

4. Tadiem has a principal place of business at 225 Wellington Street West, Toronto, Ontario, Canada, M5V 3G7. It is an agency that provides advertising creative, digital, and media planning services.

5. Tadiem is owned by five individual partners, who all live in Toronto and work full time running the company. The firm has earned countless awards for its groundbreaking creative work on various brands across a wide variety of industries, most recently being named Advertising Age's 2018 International Small Agency of the Year.

6. Constellation is a Delaware corporation with a principal place of business at 207 High Point Drive, Victor, New York, 14654. It is in the business of marketing and selling beer, wine, and distilled spirits, including Corona Extra, Modelo Especial, Ballast Point, Robert Mondavi, Kim Crawford, Ruffino, The Prisoner, SVEDKA Vodka and High West Whiskey in several international markets. Constellation is a Fortune 500 company.

7. Non-party AARM is, upon information and belief, a California company. It is an audit firm with a principal place of business at 38 Miller Avenue, Mill Valley, California 94941.

## JURISDICTION AND VENUE

8. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). This is an action between a citizen of a foreign state (Tadiem) and a citizen of the United States (Constellation).

9. Further, in the MSA, Tadiem and Constellation "agree[d] and consent[ed] that jurisdiction and venue of all matters relating hereto shall be vested exclusively in the federal, state, and local courts sitting at Rochester, New York".

10. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11. Venue in this judicial district is proper, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this litigation occurred in this judicial district.

12. Venue is also proper pursuant to the parties' agreement in the MSA thereto, as set forth above.

## FACTUAL BACKGROUND

**Constellation Retains Tadiem**

13. Already familiar with Tadiem's highly effective work on behalf of Constellation's Canadian subsidiary, in 2012 Constellation invited Tadiem to compete for the responsibility for Constellation's largest spirits brand, SVEDKA Vodka.

14. Constellation ultimately awarded that responsibility to Tadiem. This included mass advertising strategy, creative development, digital advertising, social media advertising and media planning and buying – all for the US market.

15. Based on the immediate success of Tadiem's SVEDKA work, Constellation's wine division also began awarding various US wine brands to the firm. By 2014, Tadiem had effectively become what is known in the marketing world as "agency of record" for Constellation's wine and spirits divisions.

16. In recognition of the breadth of work Tadiem was doing on both sides of the Canada/US border, Constellation's then Chief Marketing Officer, Chris Fehrnstrom, agreed to a retainer-based compensation agreement with Tadiem.

17. Tadiem routinely enters into "retainer agreements" with clients of Constellation's size and needs.

18. Retainer-based arrangements are commonplace in the marketing world, as they enable a number of mutually beneficial objectives: the agency can provide continuity of staffing based on predictable revenue and cash flow, and can develop institutional and category knowledge over time. Retainers further allow the parties to move forecasted hours between brands. This is often necessary, as individual brand requirements routinely change subject to market conditions and other circumstances.

19. Retainer arrangements are also meant to address the significant payment lag from the time that the creative agency performs work and when it is able to invoice larger clients (like Constellation) and eventually receive payment from them.

20. During the period in which Tadiem is awaiting payment, it is responsible for "carrying" or satisfying the salaries of its own employees, any freelancers or independent contractors, as well as vendors – all costs Tadiem fronts. This is a massive burden for a small firm like Tadiem.

21. The retainer arrangements address these issues.

22. Tadiem and Constellation entered into their retainer arrangement in 2014. The parties agreed on a minimum hourly commitment from the client, based on an estimate of the expected annualized hours that Tadiem would perform, and a standard hourly rate for its services. That annual amount was then divided into twelve equal payments, which were paid to Tadiem as a "retainer."

23. The relationship was an unqualified success, and Tadiem's creative coverage was expanded to include several additional Constellation brands during 2014 and 2015.

24. Throughout 2015 (FY 2016) and 2016 (FY 2017), the hours expended by Tadiem ebbed and flowed based on direction from Mr. Fehrnstrom and Constellation's marketing department. Nevertheless, in each case, Constellation remained obligated to, and did, pay Tadiem for the minimum annual hours requirement each year. Such a requirement was critical to allowing Tadiem to retain the talent it needed to keep continuity of staffing – personnel with institutional knowledge for particular brands – especially during soft periods in an episodic business cycle.

25. During 2015 and 2016, based on Tadiem's efficiency, Constellation found itself having not "used" several hundred of the minimum allotted hours of the retainer.

26. In each instance, and as a business accommodation to facilitate the parties' working relationship, Tadiem agreed to "roll over" those hours and to defray payment until a later date to be determined by the parties.

27. Constellation was appreciative and the relationship continued to expand. Ultimately, Tadiem began providing services in three distinct areas: (1) strategy and creative; (2) social media; and (3) digital media buying and planning, for over a dozen brands including; SVEDKA Vodka, Kim Crawford, Ruffino, Nobilo, RMPS (Robert Mondavi Private Selection), Mark West, Clos du Bois, The Dreaming Tree, and Ravage. The assignment also included overall corporate media work for areas including B2B Programmatic Campaign Support and Digital Media.

**Constellation & Tadiem Enter Into The MSA**

28. As the relationship between Tadiem and Constellation continued to flourish, the parties entered into a Master Services Agreement to memorialize the retainer arrangement and the parties' obligations.

29. On or around May 26, 2016, Constellation and Tadiem entered into the MSA.

30. The MSA provides that Constellation was hiring Tadiem on a non-exclusive basis to perform advertising and related services in connection with Constellation's business.

31. Section 1 of the MSA also provided that "[t]he Parties [would] execute period scopes of work" which would "detail the services and projects to be provided by Agency to Client or its designee under the [MSA]".

32. According to Section 3 of the MSA, "Agency shall bill Client and Client shall compensate Agency for all agreed upon Services at the fee(s) set forth in one or more Scope(s) of Work."[1]

33. These SOWs generically described the services to be performed by Tadiem for the relevant brand during a given year.

34. Each of the SOWs also included an estimate of how many hours of work Tadiem would perform during that year for the brand covered by that SOW. They also included a corresponding budget based on those estimated amounts and Tadiem's hourly rate.

35. As with the parties' prior practice, the estimates or budgets included in the SOWs were used as the basis for retainers that Constellation would pay Tadiem for that year, based on Tadiem's hourly rate.

36. The parties regularly referred to the SOWs – in email correspondence and in the SOWs themselves – as "retainers", "forecasts", or "budgets".

37. These retainers were intended to continue to allow the agency to provide a dedicated staff to service Constellation and its respective brands for each year.

---

[1] A scope of work will hereinafter be referred to as an "SOW."

38.     Negotiation of the SOW was an iterative process, and while it was being negotiated, Tadiem would diligently perform its services at Constellation's instruction, such instructions being delivered by phone and over email, and often on a highly expedited basis.

39.     To provide Constellation with the much-needed flexibility to change and alter marketing strategies and ideas on short notice, the MSA explicitly stated that such ad hoc instructions by Constellation, or requests for work, would constitute adequate authorization for such services to be rendered and compensated pursuant to the MSA.

40.     In particular, section 23(d) of the MSA provides that "[e]mail correspondence shall constitute written approval for the Services provided under this Agreement."

41.     Since 2016 and prior, it was routine for Constellation to request services that differed in both specificity, scope, and scale from the SOW.

42.     Pursuant to the parties' agreement, and the MSA (including its Section 23(d)), Tadiem was compensated for such work.

43.     If Tadiem ended up working more hours than what the parties had estimated in the SOW, then Constellation would be required to pay an additional fee, above and beyond the original retainer, to fully compensate Tadiem for its services.

44.     In sum, Constellation committed to paying Tadiem for all services Tadiem performed.

**The MSA's Termination Procedure**

45.     During the first 24 months after the MSA's Effective Date of May 26, 2016, the MSA could be terminated only for cause – including due to Tadiem's bankruptcy or dissolution, or a material breach of the MSA.

46. For the period after those initial 24 months, the MSA outlined a procedure whereby (a) Constellation could terminate Tadiem without cause upon 90-days prior written notice, (b) following such a termination notice, Tadiem would continue servicing Constellation during a 90-day transitional "Notice Period", and (c) Constellation would pay Tadiem Notice Period fees needed to compensate Tadiem for maintaining staffing and providing services during the Notice Period.

47. All told, the MSA's provisions reflect that at no time could Constellation terminate Tadiem without paying Notice Period fees. During the first 24 months of the MSA's term, Tadiem could not be terminated (barring a bankruptcy or material breach). After those initial 24 months, Constellation could terminate Tadiem even without cause, but it was required to pay Notice Period fees.

48. Specifically, Section 13(a) of the MSA states: "After the first 24 months of the Term of this Agreement Client may terminate this Agreement or any Scope of Work entered into under this Agreement at any time with or without cause upon ninety (90) days prior written notice to Agency (the "Notice Period")."

49. During that Notice Period, "[t]he rights, duties and responsibilities of the Parties shall continue in full force and effect . . . ."

50. In Section 13(c) of the MSA, the parties agreed that during the Notice Period "the Fees shall be pro-rated to the effective date of termination and Agency shall promptly refund any such amount paid to it in excess of the pro-rata portion of the Fees, based on the Services rendered up to the date of termination".

51. Notice period fees in contracts such as the MSA are designed to protect both parties. The client (here, Constellation) needs assurance of continued service during the

transition period after the notice of termination, and the agency (here, Tadiem) requires revenue during a period of adjustment to maintain staffing and capacity for the client.

52. Further, with larger retainer arrangements like the MSA, the eventual termination requires the agency to absorb substantial severance costs as it reduces staffing.

53. These fees are, in essence, a retainer to be paid at the time of the notice of termination, intended to allow the agency to provide a dedicated staff to service the client until the effective date of termination 90 days later.

54. Accordingly, at the time of the notice of termination for each brand, Constellation would pay Tadiem a Notice Period fee that would be, at a minimum, pro-rated based on the estimate from the parties' SOW for that year. If, however, through the date of the notice of termination Tadiem had worked more hours than the SOW estimate, the Notice Period fee would be adjusted upward, as pro-rated based on that higher number.

55. Further, if Tadiem ended up working more hours *during* the Notice Period than that pro-rated retainer, Constellation was required to pay Tadiem for the additional fees.

**Constellation Begins to Terminate Tadiem, But Continues to Demand Transitional Work, While Withholding Payment**

56. Upon information and belief, during the latter half of 2017, the responsibilities for the marketing of certain Constellation brands shifted internally.

57. Mr. Fehrnstrom had left Constellation, and was ultimately replaced as CMO of the wine and spirits divisions by Jared Fix, who was subsequently replaced by Ben Dollard. One level below CMO, the Director of Marketing for SVEDKA Vodka also changed from Diana Pawlik (the originator of the Tadiem relationship) to Carl Evans.

58. For years, Tadiem had performed creative work for SVEDKA Vodka, earning international recognition for those campaigns.

59. Nevertheless, as Messrs. Dollard and Evans began to take the reins – and although Tadiem was still under contract for SVEDKA creative under the MSA – on or about December 14, 2017 they advised Tadiem of the possibility of opening up an "RFP" process for the development of a new creative campaign for SVEDKA.

60. This notification did not include any notice of termination.

61. During the ensuing discussions between Constellation and Tadiem, the parties agreed that Tadiem would be given at least one opportunity of developing a new creative campaign for SVEDKA prior to any other agencies being invited to any RFP process.

62. In the first quarter of 2018, Tadiem presented that commissioned work product to a large group of marketers representing a cross-section of Constellation's brand management. Constellation's representatives were sufficiently impressed with Tadiem's creative ideas that the meeting ended with a round of applause.

63. Despite the fact that Tadiem's solicited work was well-received, without any explanation Messrs. Evans and Dollard advised Tadiem on March 23, 2018 that none of the creative ideas would be moving forward to a research stage. Rather, they informed Tadiem, an RFP process to solicit creative ideas from other agencies would begin.

64. Still, Constellation did not provide a notice of termination.

65. After this point, Constellation's procurement division refused to pay Tadiem for the development of the four SVEDKA creative campaigns, and subsequent revisions, claiming it had been only a speculative "pitch."

66. In other words, although Tadiem was under contract, and although that contract (the MSA) could not be terminated until May 2018, Constellation's position was that Tadiem's time and work were free.

67. In subsequent conversations with Mr. Evans, Tadiem was led to believe that its work on SVEDKA would continue to be required for social and digital creative and digital media planning and buying. In fact, Messrs. Evans and Dollard agreed to leave open the possibility that some of Tadiem's creative ideas may ultimately be tested, or join other work in a creative pre-test process.

68. When Tadiem asserted its right to payment, Constellation only slightly relented, claiming that if Tadiem did not take an initially reduced payment for the work, it would terminate the remainder of the brands.

69. Cognizant of the broader Constellation relationship, Tadiem agreed to postpone its recovery of additional amounts, reserved its rights, and accepted the partial payment for the work that it had performed for SVEDKA.

70. For the remainder of the year, Constellation alternatively kept Tadiem on "standby" and yet claimed no new SVEDKA work was forthcoming.

71. Upon information and belief, although Constellation effectively terminated Tadiem from SVEDKA creative, it elected not to send a termination notice in an attempt to circumvent the 90-day, contractually obligated "Notice Period fees" and was cognizant of the fact that, pursuant to the express terms of the MSA, Constellation could not unilaterally terminate the MSA until, at the earliest, May 26, 2018.

72. In or around May 2018, yet another restructuring took place within Constellation. Mr. Dollard was replaced as CMO, and Jim Sabia, then CMO for the beer division, was made CMO for beer, wine and spirits.

73. Within a matter of weeks, on July 23, and without any conversation or meeting with Tadiem, Loren Martin, Director of Procurement, advised Sandi Truffen, Director of Client

Services at Tadiem, that Mr. Sabia had directed him to move all remaining portions of the SVEDKA assignment to other agencies.

74. Constellation, however, has refused to pay Tadiem its full fees for the creative work that it solicited for SVEDKA, or for any Notice Period fees subsequent to advising Tadiem it would no longer seek creative work for SVEDKA.

**Constellation Concocts a Phony Audit at AARM's Insistence to Gain Leverage for Avoiding Notice Period Fees When Terminating Tadiem on a Brand-by-Brand Basis**

75. While still in limbo with regard to SVEDKA, Tadiem nonetheless pressed ahead to meet Constellation's marketing demands on the other brands, taking direction over emails and continued correspondence from Constellation's marketing department, as the FY 2019 SOW remained under negotiation as to the estimated hours and budgets for that year.

76. As part of Constellation's shifting of responsibilities, the primary responsibility for negotiating the SOW on Constellation's behalf was transitioned from the marketing department to its procurement division.

77. In 2017, Loren Martin and Charlie Shikany of Constellation's procurement department took over the responsibility for negotiating budgeted amounts of hours per brand and the overall estimate and retainer for the FY 2019 year.

78. Upon information and belief, during this same time period, Constellation engaged AARM to conduct an "audit" of Tadiem fees, charges and expenses for the prior years.

79. The "audit" was a ruse – designed to create a fictitious "offset" (the "Leverage Offset"), based on subjective critique of objective expenses incurred by Tadiem, all in connection with providing viable work to Constellation.

80. AARM is not a general accounting firm. It is a purpose-built enterprise designed and promoted to brand marketers as a tool to avoid "overpaying" advertising agencies.

81. Creation of the "Leverage Offset" (hundreds of thousands of dollars in alleged costs that had been paid without any objection, and which were fully documented and backed by Tadiem at submission) was a cost-savings strategy launched by AARM.

82. Upon information and belief, AARM's intent was to create the Leverage Offset to allow Constellation to force Tadiem – under the threat of having to "pay back" the Leverage Offset – to forego or renegotiate Notice Period fees.

83. Regardless, Constellation has used the Leverage Offset opportunistically to achieve this outcome.

**Constellation Refuses to Pay Tadiem Notice Period Fees**

84. Having put the wheels of termination in motion, and in an effort to force Tadiem to the negotiating table to save costs, Constellation refused to pay Tadiem for hours worked and agreed to, and "slow paid" invoices already in process.

85. Constellation also continued the process of terminating Tadiem, brand by brand.

86. While Tadiem had still not been properly terminated for SVEDKA creative, it was formally terminated for SVEDKA Social, Digital and Media Planning and Buying on July 23, 2018.

87. On September 10, 2018, Tadiem received notice of termination for all wine brands (except Ruffino and some holiday media buying assignments). Ruffino was exempted because production of new advertising was imminently scheduled.

88. Soon after, Tadiem received notice of termination for the remaining brand, Ruffino (Strategy), on October 15, 2018.

89. Tadiem has repeatedly requested that Constellation pay Notice Period fees under the MSA for each of the terminated brands.  Through a series of communications, Constellation has assured Tadiem that those payments would be forthcoming.

90. Despite those assurances, Tadiem still has not received payment for Notice Period fees.

91. Nevertheless, Constellation demanded that Tadiem continue working during the transitional period and beyond, or be faced with any dip in revenue flowing from softer sales.

92. This lawsuit followed.

## FIRST CLAIM
### (Breach of Contract)

93. Tadiem repeats and realleges the allegations set forth in paragraphs 1 through 92 above.

94. The MSA was a valid, binding contract between Tadiem and Constellation.

95. Tadiem performed all of its obligations under the MSA.

96. Constellation, however, has refused to pay Tadiem for the work it performed up to the dates of the notices of termination.

97. Further, based on the MSA, Constellation was required to pay Tadiem Notice Period fees for the terminated brands.  Constellation has also refused to pay those amounts.

98. Lastly, Constellation has failed to pay Tadiem Notice Period fees in connection with its termination of SVEDKA in December 2017.

99. Accordingly, Tadiem demands judgment against Constellation in an amount to be determined at trial, but in no event less than $1,500,000, plus interest.

**SECOND CLAIM**
**(In the Alternative - Breach of the Implied Covenant of Good Faith and Fair Dealing)**

100.  In the alternative to the First Claim, Tadiem repeats and realleges the allegations set forth in paragraphs 1 through 92 above.

101.  During the initial 24 months after the MSA was executed, Constellation could only terminate Tadiem based on a limited set of circumstances, including bankruptcy or material breach.

102.  Rather, Constellation was permitted to terminate Tadiem without cause beginning only in May 2018 (after the initial 24-month period), but it was required to pay Notice Period fees in accordance with Section 13(d) of the MSA.

103.  In other words, no termination under the MSA could ever occur without a corresponding obligation to pay Notice Period fees.

104.  As set forth above, in an apparent bad-faith effort to avoid having to pay Notice Period fees to Tadiem in connection with SVEDKA, in December 2017 (during the initial 24-month period) Constellation stripped Tadiem of its responsibilities for SVEDKA – effectively terminating it – without ever issuing a termination notice.

105.  Constellation was essentially attempting to have the best of both worlds – to keep Tadiem on "standby" in case it needed any ad hoc additional work, while at the same time avoid having to pay any Notice Period fees.

106.  This forced Tadiem to continue fronting the costs necessary to maintain the SVEDKA relationship (without the benefit of any Notice Period fees) just in case Constellation returned with additional requests for SVEDKA.

107.  In fact, Constellation subsequently requested that Tadiem perform additional work on behalf of SVEDKA in January 2018.

15

108.   When Tadiem asserted its right to payment, Constellation only slightly relented, claiming that if Tadiem did not take a reduced payment for the work, it would terminate the remainder of the brands.

109.   Tadiem agreed to accept the reduced payment for the SVEDKA presentation due to its fear that Constellation would terminate all of the other brands.

110.   Constellation's actions amounted to a breach of its implied covenant of good faith and fair dealing.

111.   The MSA contains an implied covenant that Constellation would not invalidly and prematurely "terminate" the agreement in an effort to avoid paying Notice Period fees.

112.   Had Tadiem known, at the time of the MSA's execution, that Constellation would (a) withhold work from Tadiem, (b) prematurely attempt to terminate simply to avoid paying Notice Period fees, and (c) force it to accept a reduced payment at risk of having all of the other brands terminated as well, then Tadiem never would have entered into the MSA.

113.   Accordingly, Tadiem demands judgment against Constellation in an amount to be determined at trial, but in no event less than $1,500,000, plus interest.

WHEREFORE, Tadiem requests that judgment be entered in its favor:

(i) on the First Claim, for damages in an amount to be determined at trial, but in no event less than $1,500,000, plus interest.

(ii) in the alternative to the First Claim, for damages in an amount to be determined at trial, but in no event less than $1,500,000, plus interest.

(iii) Such other and further relief as the Court deems just and proper.

Dated: New York, New York
March 21, 2019

          OLSHAN FROME WOLOSKY LLP

By: */s/ Brian A. Katz*
    Brian A. Katz
    Joseph Weiner (*admission pending*)
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, New York 10019
Tel: (212) 451-2300
E-mail: bkatz@olshanlaw.com

*Attorneys for Plaintiff Tadiem Inc.*